## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELISSA R. JACKSON, | : | No. 1:24-CV-1822 |
| | : | |
| Plaintiff | : | (Kane, J.) |
| | : | |
| v. | : | (Caraballo, M.J.) |
| | : | |
| PROGRESSIVE ADVANCED | : | |
| INSURANCE COMPANY, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

### I.    Introduction

This action concerns an underinsured motorist insurance dispute between plaintiff Melissa Jackson and her automobile insurance company, defendant Progressive Advanced Insurance Company ("Progressive").  Jackson asserts claims for breach of contract and bad faith arising out of her efforts to secure underinsured motorist benefits from Progressive, following an automobile accident.  Doc. 1 at 5–12.

The matter was referred to the undersigned to resolve a series of related discovery disputes that culminated in two motions pending before the court: Jackson's motion to compel discovery of information

withheld or redacted by Progressive from its claim file (Doc. 43); and Progressive's motion to bifurcate and stay discovery of the bad faith claim. Doc. 36. The undersigned thus has jurisdiction pursuant to 28 U.S.C. § 636(b)(1)(A).

As set forth below, the motion to compel discovery will be granted in part and denied in part. The motion to bifurcate and stay discovery of the bad faith claim will be denied.

## II.    Background

The parties do not appear to dispute many of the operative facts in this action. Rather, their divergence arises from interpretive and valuation differences. As alleged in Jackson's complaint, on October 23, 2022, she was injured during an automobile accident with an intoxicated driver, Brandt Evanoff. Doc. 1 at 2–4. Both Jackson and Evanoff were insured by Progressive, which waived its subrogation rights against Evanoff and consented to Jackson accepting his policy limits of $15,000. *Id.* at 5; Docs. 1-2 and 1-3. Jackson then sought to leverage the $100,000 in underinsured motorist benefits through her own Progressive insurance policy. Doc. 1 at 5–7.

The Progressive claim notes, coupled with correspondence provided by both parties, set forth the ensuing chronology of events that gave rise to this litigation and are germane to the pending motions. On February 17, 2024, Jackson's counsel sent a formal demand for the policy limit of $100,000 to Progressive claims department representative Tyeddie Williams. Doc. 43-2 at 5. For the next approximate two months, Progressive collected and reviewed additional information while evaluating Jackson's claim. *Id.* at 5–19. In an April 24, 2024,[1] letter providing additional information and again demanding payment of the $100,000 policy limit, Jackson's counsel stated, "Please advise me within the next week whether Progressive will be tendering the UIM limits of $100,000." Doc. 43-3 at 4. According to Progressive, that missive prompted a reasonable anticipation of litigation. Doc. 44 at 2.

Progressive continued to evaluate the information collected, until Williams completed the assessment and reviewed it with management

---

[1] Several of the letters contained in the record and referenced herein are dated multiple days prior to the dates they were received, according to Progressive's claim notes. None of those temporal dissonances are material to this decision.

on April 29, 2024.  Doc. 43-2 at 25.  On May 1, 2024, Progressive made its first offer to settle the claim for $34,218.  Doc. 1-6 at 2.  During a phone call that day, Jackson's counsel expressed disagreement with the offer amount and notified Progressive of Jackson's intent to commence litigation.  Doc. 43-2 at 39.

On May 23, 2024, Jackson's counsel requested that Progressive re-evaluate Jackson's medical records and pay the policy limit, and advise him accordingly within the next five days.  Doc. 43-4.  On May 28, 2024, Progressive increased its settlement offer to $40,000, Doc. 43-5, "based on the information rec[eive]d."  Doc. 43-2 at 40.  During a phone call that day, Jackson's counsel again expressed disagreement with the evaluation and conveyed Jackson's intent to commence litigation in federal court.  Doc. 43-2 at 40.  Williams  continued to review updated medical documents for Jackson.  *Id.*

On June 5, 2024, Jackson's counsel demanded that Progressive substantiate its $40,000 offer, suggested that Progressive had acted in bad faith, and threatened to "move forward accordingly."  Doc. 43-6.  That letter prompted Progressive to retain outside defense counsel,

4

Jennifer Stauffer, who spoke with Williams on June 6, 2024. Doc. 43-2 at 41–42. On June 19, 2024, Stauffer notified Jackson's counsel of her retention and confirmed that the offer remained at $40,000. Stauffer requested documentation from Jackson substantiating her medical expenses and treatment, and conveyed an intention to examine Jackson under oath, in accordance with her policy's terms. Doc. 21-2 at 2. That request for documentation was reiterated on August 19, 2024. *Id.* at 4.

Jackson commenced this litigation on October 22, 2024. Doc. 1. Although it is not entirely clear, Jackson appears to contend that litigation was reasonably anticipated by Progressive at some point after the August 19, 2024, letter from Stauffer, and no later than the filing of the complaint. Docs. 43 at 3–4, 8; 45 at 1.

On May 28, 2025, following the close of pleadings and commencement of discovery, Jackson's counsel requested a discovery conference to address disputes that had arisen concerning Progressive's privilege log and responses to interrogatories and document requests. Doc. 14. The matter was referred to the undersigned, and the parties collaboratively resolved several of the discovery disputes during a series

of court conferences and attorney meet and confers. Docs. 22–23, 26–29. Jackson was thereafter authorized to file a motion to compel addressing the remaining disputes, including a request that the Court conduct an *in camera* review of certain documents withheld by Progressive as privileged. Doc. 30.

Jackson's motion to compel (Doc. 43), and an associated motion by Progressive to bifurcate and stay discovery associated with the bad faith claim (Doc. 36) are fully briefed and ripe for decision. The Court has also received, via sealed *ex parte* submission, certain documents listed on Progressive's privilege log for *in camera* review. Docs. 35, 38.

## III.  Standard of Review

"The conduct of discovery is a matter for the discretion of the district court and its decisions will be disturbed only upon a showing of an abuse of this discretion." *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 90 (3d Cir. 1987) (citing *Marroquin-Manriquez v. I.N.S.*, 699 F.2d 129, 134 (3d Cir. 1983)). That "broad discretion to manage discovery," *Sempier v. Johnson & Higgins*, 45 F.3d 724, 734 (3d Cir.

1995), extends to discovery dispute rulings entered by United States

Magistrate Judges:

> District courts provide magistrate judges with particularly
> broad discretion in resolving discovery disputes. *See Farmers
> & Merchs. Nat'l Bank v. San Clemente Fin. Group Sec., Inc.*,
> 174 F.R.D. 572, 585 (D.N.J. 1997). When a magistrate judge's
> decision involves a discretionary [discovery] matter ..., "courts
> in this district have determined that the clearly erroneous
> standard implicitly becomes an abuse of discretion standard."
> *Saldi v. Paul Revere Life Ins. Co.*, 224 F.R.D. 169, 174 (E.D.
> Pa. 2004) (citing *Scott Paper Co. v. United States*, 943 F. Supp.
> 501, 502 (E.D. Pa. 1996)). Under that standard, a magistrate
> judge's discovery ruling "is entitled to great deference and is
> reversible only for abuse of discretion." *Kresefky v. Panasonic
> Commc'ns and Sys. Co.*, 169 F.R.D. 54, 64 (D.N.J. 1996); *see
> also Hasbrouck v. BankAmerica Hous. Servs.*, 190 F.R.D. 42,
> 44-45 (N.D.N.Y. 1999) (holding that discovery rulings are
> reviewed under abuse of discretion standard rather than de
> novo standard); *EEOC v. Mr. Gold, Inc.*, 223 F.R.D. 100, 102
> (E.D.N.Y. 2004) (holding that a magistrate judge's resolution
> of discovery disputes deserves substantial deference and
> should be reversed only if there is an abuse of discretion).

*Halsey v. Pfeiffer*, 2010 WL 3735702, at *1 (D.N.J. 2010).

In exercising that discretion, the Court is guided by the principles

set forth in Federal Rule of Civil Procedure 26(b), which permits

discovery regarding "any nonprivileged matter that is relevant to any

party's claim or defense and proportional to the needs of the case . . . .

Information within this scope of discovery need not be admissible in

evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). That liberal
discovery policy recognizes that the "[m]utual knowledge of all the
relevant facts gathered by both parties is essential to proper litigation."
*Hickman v. Taylor*, 329 U.S. 495, 507 (1947). Thus, discovery is
generally permitted of any items that are relevant or may lead to the
discovery of relevant information. *Josephs v. Harris Corp.*, 677 F.2d
985, 991 (3d Cir. 1982).

"When the Court is presented with a motion to compel discovery,
'[t]he burden is on the objecting party to demonstrate in specific terms
why a discovery request is improper. The party objecting to discovery
must show that the requested materials do not fall within the broad
scope of relevance or else are of such marginal relevance that the
potential harm occasioned by discovery would outweigh the ordinary
presumption in favor of broad disclosure.'" *Mazer v. Frederick Mut.
Ins. Co.*, 2021 WL 850984, at *1 (M.D. Pa. 2021) (citing *Clemens v. N.Y.
Cent. Mut. Fire Ins. Co.*, 300 F.R.D. 225, 227 (M.D. Pa. 2014)).

It is against this backdrop that the Court evaluates the parties'
dueling motions.

8

## IV.  Discussion

### A.  <u>Jackson's Motion to Compel</u>

#### 1.  *Production of the April 29, 2024, Claim Notes*

Jackson seeks discovery of two redacted claim notes authored by Williams on April 29, 2024, and identified in Progressive's privilege log as entry Nos. 2 and 3.[2]  According to Jackson, those notes were not prepared in anticipation of litigation, as Progressive was still in the midst of performing its regular business function of evaluating her claim.  Doc. 43 at 7.  Although Jackson does not specify her position on precisely when that business function shifted to activities performed in anticipation of litigation, she appears to contend that Progressive continued its business function through at least late August 2024, and did not necessarily anticipate litigation before she filed suit in October 2024.  Doc. 43 at 3–4, 8.

Progressive, by contrast, avers that it reasonably anticipated litigation on April 26, 2024, when Jackson's counsel demanded the

---

[2] According to the privilege log and as corroborated by the Court's *in camera* review, those documents bear Bates numbers JACKSON_002704 – 2718.  Doc. 43-1 at 2.

policy limit and set a deadline for Progressive to respond.  Doc. 44 at 2–6.  Thus, Progressive contends, the April 29, 2024, claim notes are protected by the work product privilege.

The Court finds that Progressive reasonably anticipated litigation, thus triggering the shield of work product protection, following the communications between Jackson's counsel and Progressive on May 28, 2024.  That date marked the milestone at which Progressive substantively completed its evaluation of Jackson's claim, conveyed a revised settlement offer accordingly, and reasonably anticipated litigation given Jackson's continued demand for the policy limit and reiterated threat of litigation.  Accordingly, Progressive will be required to produce the redacted information contained in entry Nos. 2 and 3 of its privilege log, dated April 29, 2024, that was withheld on the basis of work product privilege.

The work-product doctrine is a principle of federal law governed by Federal Rule of Civil Procedure 26(b)(3).  *United Coal v. Powell Constr. Co.*, 839 F.2d 958, 966 (3d Cir. 1988).  Rule 26(b)(3) provides that "[o]rdinarily, a party may not discover documents and tangible

things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). The doctrine thus "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 661–62 (3d Cir. 2003) (internal quotations omitted).

In comparing the work product doctrine to the attorney-client privilege, the Court of Appeals explained:

> The purpose of the work-product doctrine differs from that of the attorney-client privilege.... [T]he attorney-client privilege promotes the attorney-client relationship, and, indirectly the functioning of our legal system, by protecting the confidentiality of communications between clients and their attorneys. In contrast, the work-product doctrine promotes the adversary system directly by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation. Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used again their clients.

*Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1427–28 (3d Cir. 1991).

11

Critically, and as set forth in the plain language of Rule 26(b)(3), the work product doctrine is not limited to protecting materials prepared by attorneys alone.  Rather,

> [T]he doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*United States v. Nobles*, 422 U.S. 225, 238–39 (1975) (footnote omitted).

"Mental impressions and opinions of the party and its agents, however, are not protected by the work product doctrine, unless they are prepared for an attorney in preparation for possible litigation." *Safeguard Lighting Sys., Inc. v. N. Am. Specialty Ins. Co.*, 2004 WL 3037947, at *2 (E.D. Pa. 2004).  Thus, in the context of evaluating an insurer's claim files, as here, "[a]n insurance company cannot reasonably argue that the entirety of its claims files are accumulated in anticipation of litigation when it has a duty to investigate, evaluate, and make a decision with respect to claims made on it by its insureds." *Lyvan D.D.S. v. Harleysville Ins. Co., et al.*, 1994 WL 533907, at *3

(E.D. Pa. 1994). Rather, "[w]ork product prepared in the ordinary course of business is not immune from discovery." *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000).

The Court's determination thus hinges on the inquiry of when Progressive's evaluation of Jackson's underinsured motorist claim shifted from ordinary business operations to activities undertaken in anticipation of litigation. *Shaffer v. State Farm Mut. Auto Ins. Co.*, 2014 WL 931101, at *3 (M.D. Pa. 2014). "The burden of demonstrating that a document is protected as work-product rests with the party asserting the doctrine." *Conoco Inc. v. U.S. Dep't. of Just.*, 687 F.2d 724, 730 (3d Cir. 1982). Moreover, "[t]he party asserting work product protection must demonstrate that it subjectively anticipated litigation, and that the anticipation was objectively reasonable." *Solano-Sanchez v. State Farm Mut. Auto Ins. Co.*, 2021 WL 2156367, at *5 (E.D. Pa. 2021). As aptly summarized by the Honorable Joseph F. Saporito, Jr.:

> [T]he gravamen of a claim of work product protection necessarily requires an assessment of when litigation was anticipated, which is a determination not subject to a bright-line rule. Our court has long adopted a case-by-case approach. *Basinger v. Glacier Carriers, Inc.*, 107 F.R.D. 771, 774 (M.D. Pa. 1985). As recognized by the Third Circuit, "[p]rudent

> parties anticipate litigation and begin preparation prior to the
> time suit is formally commenced." *Martin v. Bally's Park
> Place Hotel & Casino*, 983 F.2d 1252, 1260 (3d Cir. 1993)
> (citing *In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d
> Cir. 1979)). Thus, whether litigation was reasonably
> anticipated is a fact-dependent inquiry.

*Mazer*, 2021 WL 850984, at *3.

Here, Progressive has not met its burden of showing that it reasonably anticipated litigation upon receipt of the April 24, 2024, letter from Jackson's defense counsel, which demanded payment of the policy limit and a response within a week.  Notably, the letter demanding the policy limit neither referenced, nor threatened litigation.  Rather, Jackson's counsel simply requested, "Please advise me within the next week whether Progressive will be tendering the UIM limits of $100,000."  Doc. 43-3 at 4.  Although a reasonable person could interpret that request to contain an implied threat of litigation, such a person could equally view the communication as one designed by an attorney, representing his client's interests, to expedite Progressive's evaluation of a claim that was then pending for over two months.  *See Neidich v. Progressive Advanced Ins. Co.*, 2018 WL 4006397, at *2 (E.D. Pa. 2018) ("[A] lawyer's mere suggestion of a lawsuit is not enough to

14

make an insurer reasonably anticipate litigation when the insurer's evaluation of the claim is ongoing.").

Progressive relies on authority finding a reasonable anticipation of litigation when a claimant's counsel "demands an amount far in excess of the insurer's evaluation and/or mentions litigation in a demand letter." Doc. 44 at 4 (collecting cases). Yet here, Jackson's counsel did not expressly mention litigation in the April 24, 2024, letter, and Progressive had not yet completed the very evaluation necessary to gauge whether the demand was excessive. Thus, the April 24, 2024, letter cannot be deemed one that objectively and reasonably created an anticipation of litigation, particularly when Progressive remained in the midst of evaluating Jackson's claim and formulating an offer. *See Long v. Progressive Advanced Ins. Co.*, 2024 WL 5082323, at *2 (E.D. Pa. 2024) (finding no anticipation of litigation because "while the litigation demand that Ms. Long's counsel sent Progressive might have prompted it to conduct the evaluation (or conduct it faster), it had a separate, business-related obligation to conduct that evaluation.").

Progressive also fails to meet its burden to demonstrate a subjective anticipation of litigation resulting from the April 24, 2024, demand letter. Critically, neither Progressive's claim notes, nor its actions following receipt of the letter, reflect a shift from ordinary business activities to an anticipation of litigation. Rather, the record reveals an ongoing review of Jackson's medical information, culminating in a "completed assessment based on the information rec[eive]d" by Williams, her review with management, and Progressive's initial offer of $34,218 on May 1, 2024. Docs. 43-2 at 19–39; 1-6 at 2. In other words, activities flowing from Progressive's obligation to investigate, evaluate, and decide Jackson's claim; not from an anticipation of litigation.

Moreover, Progressive does not explain what it would have done differently after receiving the April 24, 2024, demand letter, had it only conducted its ordinary business, instead of purportedly preparing for litigation. *See Long*, 2024 WL 5082323, at *2 ("Progressive has not suggested that the evaluation that it conducted differed in scope or character from the evaluation that it would have conducted if it

16

received a claim from Ms. Long but no demand letter."). Indeed, although not determinative, Progressive did not even commence the process of retaining defense counsel until over a month later. Doc. 43-2 at 41–42.

The claim review process continued after Progressive's initial offer, as Williams received and reviewed updated medical records, including in response to Jackson's request that Progressive re-evaluate its position. Docs. 43-2 at 40; 43-4. Ultimately, Progressive's ongoing evaluation yielded a revised offer of $40,000 on May 28, 2024, "based on the information rec[eive]d." Doc. 43-2 at 40. And although Jackson's counsel had, in the interim, unequivocally threatened litigation twice, Doc. 43-2 at 39–40, Progressive's actions did not reflect a subjective anticipation of litigation until after the exchanges of May 28, 2024. *See Wagner v. Allstate Ins. Co.*, 2016 WL 233790, at *6 (E.D. Pa. 2016) (finding that demand letter threatening lawsuit did not cause insurance company to reasonably anticipate litigation, when it was still in the process of receiving and evaluating the insured's medical records, to extend a settlement offer).

17

The shift from ordinary business activities occurred once, on May 28, 2024, Progressive extended its revised offer, Jackson maintained her policy limits demand and reiterated a threat of litigation, and Progressive ceased substantive claims evaluation. Having at that point completed its evaluation, and determined that Jackson nonetheless demanded a significantly greater settlement, Progressive both objectively and subjectively anticipated litigation. *See Solano-Sanchez*, 2021 WL 2156367, at *6 (finding a reasonable anticipation of litigation when claim review completed and valued far below the policy limit demanded). The retention of outside defense counsel approximately one week later, after Jackson accused Progressive of acting in bad faith, Doc. 43-6, confirms that determination, *see Hydrojet Servs., Inc. v. Sentry Ins. Co.*, 2022 WL 2168655, at *3 (E.D. Pa. 2022); a conclusion corroborated by the Court's *in camera* review of the redacted claims notes on June 6, 2024, and thereafter.

Accordingly, the Court finds that Progressive's records created after the May 28, 2024, exchange with Jackson's counsel are eligible for work product protection. The claim notes created on April 29, 2024, at

18

entry Nos. 2 and 3 of Progressive's privilege log, fall prior to that anticipation of litigation and the motion to compel their production will be granted.

### 2. *Production of Reserve Information*

Jackson seeks discovery of two redacted claim notes containing reserve information, identified in Progressive's privilege log as entry Nos. 1 and 3.[3]  Jackson avers that the reserve information is relevant to her bad faith claim, and that when, as here, the parties dispute claim valuation instead of a coverage determination, reserve information is discoverable.  Doc. 43 at 5–6.  Progressive contends that reserves generally are not discoverable, particularly those prepared in anticipation of litigation.  Doc. 44 at 7.  The Court will order production of the reserve information, for the reasons set forth below.

To recover under the bad faith statute, Jackson must establish, by clear and convincing evidence: "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly

_____

[3] According to the privilege log and as corroborated by the Court's *in camera* review, those documents bear Bates numbers JACKSON_002694 and 002718.  Doc. 43-1 at 2–3.

19

disregarded its lack of reasonable basis." *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir. 1997) (citing *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994)).  "Actionable bad faith encompasses behavior beyond the denial of a claim without a reasonable basis, including an insurer's investigation of a claim." *Keefer v. Erie Ins. Exch.*, 2014 WL 901123, at *3 (M.D. Pa. 2014).  "[T]he broad language of [S]ection 8371 was designed to remedy all instances of bad faith conduct by an insurer . . . . Therefore, . . . [a]n action for bad faith may also extend to the insurer's investigative practices." *Hollock v. Erie Ins. Exch.*, 842 A.2d 409, 415 (Pa. Super. Ct. 2004) (internal quotation marks and citations omitted). "Implicit in the statute is 'the requirement that the insurer properly investigate claims prior to refusing to pay the proceeds of the policy to its insured.'" *Keefer*, 2014 WL 901123, at *3 (quoting *Bombar v. West Am. Ins. Co.*, 932 A.2d 78, 92 (Pa. Super. Ct. 2007).

Parties litigating bad faith claims regularly contest the discoverability of an insurer's reserve information.  "An insurance reserve is a pool of funds allocated to satisfy obligations that may arise

20

under a claim." *Peco Energy Co. v. Ins. Co. of North America*, 852 A.2d 1230, 1232 n.3 (Pa. Super. Ct. 2004). Pennsylvania law "requires insurance companies to set aside reserves upon notice of potential losses under their policies." *Fidelity and Deposit Co. of Maryland v. McColloch*, 168 F.R.D. 516, 525 (E.D. Pa. 1996). Reserve information often, as here, appears in an insurer's claim file.

The potential relevance of an insurance company's reserve information to a bad faith claim is apparent. As an initial matter, reserves "must have some relationship to the insurer's estimation of the insured's potential liability. Otherwise, the setting aside of reserves would serve little, if any, purpose." *N. River Ins. Co. v. Greater New York Mut. Ins. Co.*, 872 F. Supp. 1411, 1412 (E.D. Pa. 1995). Thus, "[t]o the extent an insurer's reserve for a case is much larger than the amounts offered its insured in settlement, a jury might reasonably infer, in the absence of some plausible explanation by the insurer, that the insurer was disregarding its obligation to deal reasonably with its insured." *Cicon v. State Farm Mut. Auto. Ins. Co.*, 2015 WL 5021736, at *4 (M.D. Pa. 2015); *see also Consugar v. Nationwide Ins. Co. of America*,

21

2011 WL 2360208, at *5 (M.D. Pa. 2011) ("The amount set aside for reserves provides some evidence of the value assigned by defendant to plaintiff's claim. Since plaintiff here claims that defendant acted in bad faith, a comparison between the reserve value of the claim and defendant's actions in processing plaintiff's claim could shed light on defendant's potential liability.").

As "the amount set aside for reserves 'is certainly germane to any analysis [defendant] made of' the claim's value, and of whether defendant acted in bad faith in processing the claim," *Consugar*, 2011 WL 2360208, at *5 (quoting *N. River Ins. Co.*, 872 F. Supp. at 1412), Pennsylvania federal courts have permitted the discovery of reserve information "in a bad faith action when the claim relates to the insurer's failure to settle or where there is a discrepancy regarding the value of the claim. . . . However, when the bad faith claim is based on a denial of coverage and 'does not involve the value of the claim or [the plaintiff's] estimation of liability . . . the reserve information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.' " *Barnard v. Liberty Mut. Ins. Corp.*, 2019 WL

461510, at *5–6 (M.D. Pa. 2019) (collecting cases); *see also Ockford v. Encompass Ins. Co.*, 2024 WL 4437820, at *3–4 (E.D. Pa. 2024) (same).

Here, the bad faith litigation concerns a dispute over the parties' differing valuations of Jackson's claim, not coverage. Accordingly, the Court finds the reserve information relevant to Jackson's bad faith claim for discovery purposes, and will join the prevailing view of Pennsylvania federal courts that have ordered production of reserve information in bad faith litigations. *See, e.g., Ockford*, 2024 WL 4437820, at *3–4; *Hydrojet*, 2022 WL 2168655, at *7–8; *Mazer*, 2021 WL 850984, at *3; *Neidich*, 2018 WL 4006397, at *2–3; *Smith v. Progressive Specialty Ins. Co.*, 2015 WL 6738067, at 2 (W.D. Pa. 2015); *Cicon*, 2015 WL 5021736, at *4; *Borgia v. State Farm Mut. Auto. Ins. Co.*, 2014 WL 4375643, at *4 n.5 (E.D. Pa. 2014); *Shaffer*, 2014 WL 931101, at *3; *Keefer*, 2014 WL 901123, at *3; *Consugar*, 2011 WL 2360208, at *5.

Although the Court appreciates Progressive's concern that the discoverability of reserves could encourage the filing of bad faith claims solely to obtain that information, the position neither alters the Court's reasoning, nor impacts the reserve information's relevance. Other

23

mechanisms exist for addressing claims advanced in the absence of a good faith basis. *See* Fed. R. Civ. P. 11; 28 U.S.C. § 1927. Moreover, as the reserve information withheld from production is contained in documents dated February 17, 2024, and April 29, 2024, Doc. 43-1 at 2–3, Progressive's assertion of work product protection does not apply, as both documents fall before the date on which it reasonably anticipated litigation, per the Court's analysis above.

Accordingly, Jackson's motion to compel the production of unredacted reserve information in Progressive's privilege log entry Nos. 1 and 3 will be granted.

### 3.   *Production of Redacted Claim Notes*

Jackson requests *in camera* review of documents withheld from production on the basis of the attorney-client privilege. Doc. 43 at 9–10.[4] According to Jackson, the privilege log entries lack sufficient description for her to gauge whether the communications are of a privileged or ordinary business nature subject to production. *Id.*

---

[4] The documents are listed on Progressive's privilege log at entry Nos. 4–15 and 18–24, bearing Bates numbers JACKSON_002721–2728. Doc. 43-1 at 3–7. Jackson does not challenge the privilege designations for entry Nos. 16, 17 or 25, bearing Bates number JACKSON_002725 and 002728.

24

Progressive avers that its communications with outside defense counsel were limited to an attorney-client capacity, Doc. 44 at 7–10, and provided the challenged documents *ex parte* for *in camera* review. Docs. 35, 38. The Court finds that all challenged documents reflect attorney-client privileged material, and were withheld from production appropriately.

As this is a diversity action involving a state bad faith claim, Pennsylvania law governs whether the attorney-client privilege applies to the challenged documents. *See* Fed. R. Evid. 501; *Montgomery County v. MicroVote Corp.*, 175 F.3d 296, 301 (3d Cir. 1999). Under Pennsylvania law, the attorney-client privilege protects "confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice." *Gillard v. AIG Ins. Co.*, 15 A.3d 44, 59 (Pa. 2011); *see also* 42 Pa. Cons. Stat. Ann. § 5928 ("In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client.").

The privilege thus "applies to any communication that satisfies the following elements: it must be '(1) a communication (2) made between [the client and the attorney or his agents] (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client.'" *In re Teleglobe Communications Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (quoting the Restatement (Third) of the Law Governing Lawyers § 68 (2000)). The attorney-client privilege facilitates "[f]ull and frank communication between attorneys and their clients." *Wachtel v. Health Net, Inc.*, 482 F.3d 225, 231 (3d Cir. 2007). The privilege "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn v. United States*, 449 U.S. 383, 389 (1981).

Although the privilege protects from disclosure attorney-client communications, it does not extend to the underlying facts conveyed in those communications. *Id.* at 385. Thus, while recognizing its value, "[b]ecause the attorney-client privilege has this effect of withholding relevant information from fact-finders, federal courts must apply it only where necessary to achieve its purpose." *Wachtel*, 482 F.3d at 231.

Accordingly, "because the purpose of the privilege is to promote the dissemination of sound legal advice, the privilege will extend only to advice which is legal in nature. Where a lawyer provides non-legal business advice, the communication is not privileged." *Id.*

"Federal courts are further required to assess the application of the privilege on a case-by-case basis." *Foy v. Encompass Home and Auto Ins. Co.*, 2023 WL 6609016, at *5 (M.D. Pa. 2023); *see also Wachtel*, 482 F.3d at 230 ("Rule 501 requires the federal courts, in determining the nature and scope of an evidentiary privilege, to engage in the sort of case-by-case analysis that is central to common-law adjudication."). "The burden of proving that the (attorney-client) privilege applies is placed upon the party asserting the privilege." *Matter of Grand Jury Empanelled Feb. 14, 1978*, 603 F.2d 469, 474 (3d Cir. 1979) (quoting *United States v. Landof*, 591 F.2d 36, 38 (9th Cir. 1978)).

Here, the privilege log furnished by Progressive references the Bates number of each redacted document, its date and document-type, the author and recipient, a summary description of the document, and

the privilege asserted.  *See generally* Doc. 43-1.  The summaries include

descriptions such as: "Summary of email with defense counsel regarding

strategy for defense of lawsuit," and "Summary of phone call with

defense counsel mental impressions, opinions, and conclusions of

Plaintiff's claim and strategy for defense of lawsuit."  *Id.*  Moreover, all

of the challenged entries concern communications in which outside

counsel was either the author or recipient.  *Id.*

Jackson does not specify what additional details she deems

necessary to evaluate the claimed privilege, above and beyond those

relatively robust descriptions.  Rather, she seeks *in camera* review on

the premise that defense counsel "was consulted in early June to assist

with the business function of evaluating the UIM claim," not necessarily

for legal advice.  Doc. 43 at 9.  In other words, despite the privilege log

stating that the communications concerned litigation defense, Jackson

posits that they actually reflect claim evaluations.  *Id.* at 10.

All of the documents challenged by Jackson fall between the dates

of June 6, 2024, and October 17, 2024.  Thus, and as set forth above,

they were created after Progressive reasonably anticipated litigation

28

and hired outside defense counsel.  Doc. 43-1 at 3–7.  Although the documents occurred prior to the filing of this action on October 22, 2024, the attorney-client privilege is not contingent on the existence of an active litigation.  Rather, the key inquiry is whether the client is seeking or receiving the attorney's legal advice.  *In re Teleglobe Communications Corp.*, 493 F.3d at 359; *see also Cicon*, 2015 WL 5021736, at *3 (rejecting contention that communications prior to the commencement of litigation, but after plaintiff threatened litigation, were not shielded by the attorney-client privilege).

Having conducted an *in camera* review, the Court finds that Progressive met its burden of establishing that the redacted material reflects communications made for the purpose of obtaining or providing legal advice.  The Court is satisfied that Progressive's retained defense counsel were acting as legal advisors, not as claims investigators.  The communications with those attorneys are thus subject to the protections of the attorney-client privilege, and were properly withheld from discovery.  The Court will deny Jackson's motion to compel the production of privilege log entry Nos. 4–15 and 18–24, accordingly.

### B.    Progressive's Motion to Sever and Stay

In a related motion, Progressive seeks to bifurcate and stay

discovery on the bad faith claim.  Doc. 36.  Although the motion is titled

as one seeking severance, Progressive uses that term interchangeably

with bifurcation, Doc. 37 at 6; a related but distinct procedural concept.

The severance of claims, governed by Federal Rule of Civil Procedure

21, creates separate and independent actions.  *White v. ABCO Eng'g*

*Corp.*, 199 F.3d 140, 145 n.6 (3d Cir. 1999).  Bifurcation, governed by

Federal Rule of Civil Procedure 42(b), "separates elements of the

complaint for trial."  *Id.*  As a review of Progressive's motion determines

that it seeks bifurcation, the Court's analysis will proceed under Rule

42(b).[5]

---

[5] Progressive also does not clarify whether it seeks bifurcation of the claims for
judgment purposes, or only bifurcation of the pre-trial discovery phase, as it
references both concepts interchangeably.  *Compare, e.g.*, Doc. 36 at 1–2
(referencing only discovery) *with* Docs. 37 at 7; 41 at 2 (referencing production of
bad faith discovery after the breach of contract claim is resolved or tried).  Jackson
appears to interpret the motion as one seeking both forms of relief.  *See generally*
Doc. 40.  Indeed, it is not readily apparent what purpose delayed discovery of the
bad faith claim would serve absent a corresponding bifurcation of the two claims for
judgment purposes, whether by dispositive motion or by trial.  In any event, the
Court's Rule 42(b) analysis here does not prejudice Progressive's future ability to
seek bifurcation of the claims at trial from the presiding judge.

Progressive's motion appears to be rooted in its concern over producing alleged privileged documentation that the Court addressed above when adjudicating the motion to compel: the April 29, 2024, claim notes withheld as work product; reserve information; and documents withheld as protected by the attorney-client privilege. Docs. 37 at 3; 41 at 2–3. To the extent that concern does not extend to other discovery— and Progressive does not identify any—the Court's decision on the motion to compel may well have rendered the motion to bifurcate and stay moot, as Progressive will not be required to disclose any documents deemed privileged. Nonetheless, having evaluated the merits of the parties' respective positions, the Court will deny the motion to bifurcate and stay discovery on the bad faith claim.

Rule 42(b) permit the Court to bifurcate "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). "The moving party bears the burden of establishing the need to bifurcate." *Consugar*, 2011 WL 2360208, at *7. "[B]ifurcation is wholly within the court's discretion." *Newhouse v. GEICO Cas. Co.*, 2017 WL 4122405, at *2 (M.D. Pa. 2017). The Court also has the discretion to

31

stay discovery. *See In re Orthopedic Bone Screw Prod. Liab. Litig.*, 264
F.3d 344, 365 (3d Cir. 2001).

Four factors are routinely considered when determining whether
to bifurcate: "(1) whether the issues are significantly different from each
other; (2) whether they require separate witnesses and documents; (3)
whether the non-moving party would be prejudiced by bifurcation; and
(4) whether the non-moving party would be prejudiced if bifurcation is
not granted." *Craker v. State Farm Mut. Auto. Ins. Co.*, 2012 WL
3204214, at *1 (W.D. Pa. 2012) (citing *Official Comm. of Unsecured
Creditors v. Shapiro*, 190 F.R.D. 352, 355 (E.D. Pa. 2000)).

Here, an analysis of those factors militates against bifurcation and
the requested stay. First, although breach of contract and bad faith
claims may engender distinct legal issues, their associated facts share
considerable overlap here. As the Honorable Malachy E. Mannion
observed in a similar scenario:

> In the breach of contract claim, the question for the jury will
> be whether the plaintiff suffered injuries from the accident
> that were covered under her UIM policy and she was not
> otherwise properly compensated. Similarly, the bad faith
> claim will require the jury to determine whether the
> defendant's investigation into those same injuries was

32

reasonable and, if so, whether there was a reasonable basis
supporting the defendant's offer of settlement. The pivoting
point for both cases will be the plaintiff's injuries, represented
through relevant medical evidence and the defendant's claim
file. The jury will be able to properly evaluate the entire case
including the accident, the plaintiff's injuries, the defendant's
investigation, and, finally, the attempts to settle the matter.

*Griffith v. Allstate Ins. Co.*, 90 F. Supp. 3d 344, 346–47 (M.D. Pa. 2014).

Here, too, both claims involve consideration of the nature of Jackson's

injuries, both historical and recent, and Progressive's efforts to

investigate those injuries.

Although Progressive avers that the "bad faith claim is contingent

on the trial of her UIM claim," Doc. 41 at 2, a bad faith claim can

survive independent of the associated breach of contract claim.

*Ferguson v. USAA General Indemnity Co.*, 334 F.R.D. 407, 410–11

(M.D. Pa. 2019) (collecting cases). Progressive refutes that authority by

contending that the bad faith claim is dependent in this particular

action, because Jackson's complaint is premised on only Progressive's

evaluation of her claim. Doc. 41 at 1–2. But "[b]ad faith is a frivolous

or unfounded refusal to pay, lack of investigation into the facts, or a

failure to communicate with the insured." *Frog, Switch & Mfg. Co. v.*

*Travelers Ins. Co.*, 193 F.3d 742, 751 n.9 (3d Cir. 1999). And here, a core theme running through Jackson's complaint lies in her umbrage with Progressive's alleged refusal to justify through medical records its determination that the settlement offer should be tempered by Jackson's pre-existing injuries, including after her counsel raised that specific protest. Doc. 1 at ¶¶ 37–46, 49–51, 55–61. In other words, an alleged failure to properly evaluate and conduct a reasonable investigation that serves as a basis for the bad faith claim potentially independent of the breach of contract claim.

Turning to the second inquiry, although the bad faith claim may require some additional testimony and evidence specific to the investigation and evaluation of Jackson's claim, her injuries, the underlying accident, and the $15,000 settlement Progressive paid through Evanoff's own policy are common to both claims and involve many of the same documents and witnesses. Indeed, it would be difficult to surmise how either claim could be tried without significant testimony from both Jackson and Tyeddie Williams, the Progressive claims representative. And Progressive's claim file, Jackson's medical

34

evidence, and the parties' settlement communications may prove critical documents in adjudicating both claims.

Third, the prejudice to Jackson in bifurcating the claims is clear. "Bifurcation would essentially double the life of this action requiring a second discovery period, more dispositive motions, more pre-trial motions, and a completely separate second trial." *Griffith*, 90 F. Supp. 3d at 347. That approach, which embodies the antithesis of judicial efficiency, also entails significant costs and burden on Jackson. Indeed, the prospects of attempting to separate discovery based on the two respective claims, as a practical matter, are not promising and likely to generate confusion, mistake, and further disputes.

Conversely, the resulting prejudice for Progressive is not evident. Although Progressive claims that bifurcation and stay "will avoid burdensome and complicated discovery issues . . . [and] will simplify discovery," Doc. 37 at 6, its motivation for seeking bifurcation appears rooted in its concern over producing the documents sought in Jackson's motion to compel. As the Court has already resolved those specific challenges, and Progressive otherwise retains the protections of the

work product and attorney-client privileges, it has not identified any alternate prejudice resulting from the denial of bifurcation.

The Court finds that bifurcation in this action is likely to waste judicial resources and cause more inconvenience than convenience. Progressive has not met its burden to establish otherwise.  Absent bifurcation, and considering the Court's decision on the motion to compel, there remains no justification for staying discovery. Accordingly, Progressive's motion to bifurcate and stay discovery on the bad faith claim will be denied.

## V.    Conclusion

For the reasons set forth above, the motion to compel discovery will be granted in part and denied in part.  The motion to bifurcate and stay discovery of the bad faith claim will be denied.  An appropriate order shall follow.


Date:  December 11, 2025          **_s/ Phillip J. Caraballo_**
                                  Phillip J. Caraballo
                                  United States Magistrate Judge